Justice, this is not an ERISA case. Both this circuit and other circuits have held so. We are in a sick leave payroll practice setting. I don't believe there's any argument about that. In this context, it was summarily decided for the bulk of the issues were focused on the summary judgment for ERISA, that someone who in 1999 found out in 2001 that she had been shortchanged on the formula for her sick leave, then brought that to the attention of the IBM and was told, no, that's not true. In fact, and I think the record is straightforward, she started with IBM in April of 96. She was actually paid by IBM, IBM paychecks for those payroll periods from 97 through 01. IBM and not Tivoli processed her claim in 99 as well as in 01. The agreement and plan of merger between IBM and Tivoli promised that the Tivoli employees would, of course, be able to, quote, as I say in Exhibit 2, in my actually from Exhibit 2, but it's on page 16 of my brief, to, quote, participate in benefit programs of parent IBM, including severance, et cetera, which included these benefit programs. She was given a booklet on the payroll practice, and she was. Well, does she say that she was given a booklet on this payroll practice at any relevant time? I did not read that anywhere in the record. That's right. On my page 16, Exhibit 5, Administrative Record, pages 376 through 368, Plaintiff was given a booklet which described the payroll practice of IBM, which provided for the continuation of her. And she got that in 1997? I think she, yes. It was at or near the time of her. I read her testimony, and I understood her to say that she had never been given it. She had no recollection of having been given that. Well, Your Honor, I believe the record is different. We can focus on it, and I'll look at it during the, during my time I'm seated. But I believe that is the fact, and that is the case. What page are you suggesting? I show it at Administrative Record 376 through 3, maybe I'll state it differently, 386 through 376. We'll give it a look. I don't have that, but I will look. Anyway, the point is, Your Honors, when I went on summary judgment, the most argument we were making was over the question of the ERISA, or beyond that. And when it comes down to what inference in a summary judgment setting one must have, if you're paid by someone, if you're entitled to it because you found out the second time through that you got it, and there was no change, no argument of any change in any. No, but there is an argument of a change. They say it changed. Well, Your Honor, it couldn't have changed, because from the moment she became an employee, which predated either of these two payroll practices, that there was no difference. They have a very specific explanation, which is in the record. If you can disprove it in a way that would raise an issue of summary judgment, you can show us. But their argument is that the agreement was that the compensation and the benefits from the old company would continue. She had been an employee of the old company, and that at some point in the future there would be a transition to the new plan, and that there was a transition to the new plan, which occurred before the second incident. And that's why the first incident and the second incident were treated differently. That's their explanation. Now, if you can disprove it, or at least raise an issue of fact, then we were somewhere else. But it doesn't help to say they didn't say that. Okay, Your Honor, in all deference, I understand your point, and thank you for focusing in on it. The first one is that she was paid by IBM. She was paid by IBM. She became, when she was intimately merged, that's what happened. And at that time, which predates all of this by years, she was told, you are now an IBM employee. From that moment on, Your Honor, she was paid by IBM. She was she was apparently not paid at the rate she would have been paid as other IBM employees were paid. She was paid more. That's only because she was in sales. What she did was basically a commission based work. And we know that because her commissions went from 90 in 1996 from 52 all the way to 98 to 727000 in commission sales for IBM. She was selling IBM products. She was paid by IBM. It was the the reference in the relationship is not with some other employer. It's there's no I don't know. I don't know what the record shows on this. But in my understanding of your opponent's position is that people who were in sales were paid at two different rates. The people who worked for Chivalry and that ghost division actually were paid more in a way of commissions than people who were all along maimed by IBM sales workers. Your Honor, but the difference was in this setting that the payment, no matter how you get there and what your tier is, the payment of the commission is included in the compensation. But it gives life to their argument that Chivalry people were paid different were were handled differently for employment purposes than the people who had been with IBM all along and were not being phased in from the Chivalry branch. I understand your point. It makes and I certainly concede to the court that it does give it like life. However, I think it also leaves us with two inferences to be drawn from that not to be disposed of in summary judgment. That is, I think, the thrust of I'm reading from a declaration where they say, do you remember whether Mr. Fogarty or anyone else at the company distributed any new handbooks or documents relating to employee benefits in 1997? I don't recall. Do you remember any announcements regarding documents? Did you ever remember any announcements for planning any employee benefits or any change in those from 1996? I don't recall any changes. So she doesn't seem to be claiming that she was told at the time of I'm reading from something. Yes, I'm with you. I'm with that that she was told that when she became an IBM employee, her benefits change. She does not claim that in all deference. Your Honor, I understand what you read, but I think that doesn't you know, we're looking to put a very fine point on this here. And I don't believe that that fine point is evidenced by the quote that Your Honor just read. If reasonable minds can differ over it, so be it. But I don't believe that's really that doesn't get us there. What gets us there is where she There was no change from before 96 to after 96. And before 96, she was a Tivoli employee and she had these benefits. And why doesn't it prove that? And why isn't And why doesn't it go to that point? If there was no point at which her pre-96 benefits changed. Your Honor, what changed was she became an IBM employee and she was paid by IBM on IBM checks and statements. Let me ask you something. Can you just address the race judicata issues or claim splitting or whatever, briefly, please? Sure. First, recall to the Court that I came in this case as secondary counsel. There had been a contract case urged here because the date for amendment, and I tried to amend our complaint, was beyond the Court's order. But I was still within the statute. That I brought the tort action separately, and those are, in my judgment, and I believe as supported by California case law, which I've urged in the brief, separate rights to be asserted. Does the tort action depend on the truth of the contract action? In other words, It may not. Excuse me. I'm sorry. Yeah. Well, go ahead. Why not? It may not. In broad theory, but just in general analysis, does in no way depend on the tort law. Well, under California law, bad faith law does depend on there being a contract violation. Your Honor, that's my specialty in law, and in all deference to the Court, we have case law in California that, although it is a hybrid tort, the specific findings of our Supreme Court most recently in the, I'm going to get it wrong, but it's our Supreme Court, O'Flanagan or O'Scalion or one of those by our Supreme Court in the last six months, continue to reassert that we are a hybrid tort. It does not depend on the contract right. You can stand alone, and some courageous counsel have dismissed their bad faith cases and, excuse me, dismissed their contract cases and litigated just the bad faith cases. You may be able to stand alone, but can you have a bad faith denial of contract rights if you don't have a contract right? My understanding of California law is no. Are we in an insurance setting only? No. No? I don't know the answer beyond insurance. That's not my area of expertise. Beyond insurance, California has given up the bad faith denial of contract theory. In my case. You only have 30 seconds left. Thank you, Your Honor. If you wanted to save time. I do. Thank you very much for pointing it out to me. I believe that they are different rights, and the fraud action, which was the second action, the Yonkin 2, does stand alone and does have a separate basis, both in fact and in law. I'll reserve the rest of my time. Thank you. Good morning, Your Honors. Chris Price on behalf of Defendant IBM. And I agree with some of the points the court was making that the issue of whether or not Ms. Yonkin was an IBM employee is not an issue. She was an IBM employee, and we can see that she was. The only question is whether IBM had promised her, made an offer to her, to provide her with an average of commissions for her disability leave. And the burden was on the plaintiff to produce that evidence, and the plaintiff has failed. And in fact, IBM has produced evidence showing clearly that at this time, there was a transitional phase where the Tivoli division was transitioning over to IBM policies. And specifically as to the compensation plans and to the medical leave benefits, that did not come into place until January 2001. Have you shared anything? You've shown a lot of internal decision-making, but have you shown any communication to the Tivoli employees regarding their rights at the time of the transition? I think the earliest evidence of what the specific communication to a Tivoli employee, and we've focused on plaintiff, is when she asked in 1999, what am I eligible for when I go on disability? And the reply was that you were entitled to 100% of your base pay, which actually was more generous than the Tivoli plan had been. IBM decided on its own to up that from 60% to 100% of base pay. And I believe that that was the earliest recorded communication to her. Unfortunately, we don't know what was in the documents that were provided to her. Your Honor is correct that she doesn't remember what was provided to her. And I do want to focus in on this representation that's been made, that Exhibit 5, which is the sickness and accident plan, which incorporates the average of commissions for a leave. They claim that was given to her on the day she was hired. And that's just absolutely false. And I wanted to add one more depo site on that. It's in Exeter Record 2 on page 267, where I asked her in deposition. She's talking about how a friend in April of 2001 had told her about the sickness and accident plan. And I asked her, was that the first time you had heard that the 36-month average was a part of an IBM benefit plan? And her answer was yes. So 2001 was the first time that she had heard that. So there's... Do you have any idea what's on the pages that he cited? I don't have them. Well, I believe Plans Council has cited two pages that aren't in the record of her deposition, page 15, page 20, I believe. And I have read those. And what's being discussed there is obviously a package that she says was regarding her medical insurance, and that she filled out those forms and turned those in. And I questioned her several times about whether or not there was a disability plan that she could remember in that. And she said no. So I think it's very clear here. Questions about the race judicata questions, which are intriguing and complicated. Certainly are. Do you want to briefly tell me why you think the second claim, the second cause of action can't go forward? Well, when we initially filed the motion to dismiss, there had not been a judgment on the summary judgment motion, obviously. And the issue at that time was bar on claim splitting. All right, but then there was. And then the question is whether California law, that your position is that California preclusion law applies, right? I believe that's correct. There was some dispute on that before, but I believe that that's the appropriate rule to apply. All right, so here's the weird question. California preclusion law would not recognize a trial court judgment as a final judgment, right? I believe it would. Well, generally it doesn't. I mean, with regard to California courts, it doesn't. Now, do we have some kind of a hybrid here that says, but when it's a federal court judgment, we'll recognize the federal trial court judgment as final, even though we would then apply California standards to it? I don't know that, Your Honor. I mean, I don't know that we have to get there, because I believe the bar on claim splitting justifies the court's dismissal of the bar on claim splitting, whether or not there's. I have a problem with two, because I would be very dubious that a claim splitting law that has no roots in full faith and credit and isn't based on a final judgment is binding on a federal court, even in a diversity case. That's basically a procedural question. I would think that would be governed by Erie, when it's not based on finality. It's not based on finality. Right. If it's not based on finality, I don't know where you'd get the notion that we're going to import California law to the question of how a federal court is going to handle this matter. Well, Your Honor, I believe the result is the same under the federal rule, which has to do with this common nucleus of fact, or the California primary rights theory. But that's a ratio to Conner rule. I'm going around in circles here, because either there is a final judgment at the time that the summary judgment was entered, which there would be if we were using federal preclusion law. But I don't know about if we're really using California preclusion law, or there wasn't one, in which case there are various ways that a federal court would handle two parallel cases. I mean, they would consolidate them before a single judge, and the judge might stay one until the other is concluded and so on. But I don't know that you apply California claim-splitting law. I confess to not having focused on what the federal law would have been on this appeal. We did brief that in our breach to the court, where we were arguing that federal case law would bar this kind of claim-splitting, whether or not there was a final decision. I want to emphasize the procedural posture here. Plaintiff's counsel has said that he tried to amend after he had transferred onto the case. And in fact, he'd been on the case several months and had not amended. That's clear in the record. And he moved to amend, and that issue was fully briefed. And the district court denied, claiming that it was untimely and there was no excuse for its untimeliness. And it was after that that he filed the subsequent action, which I believe was just a way to get around the district court's ruling in what we call Yonkin 1. And whether it's barring claim-splitting or res judicata because there's a final judgment under California federal law, I just don't see how he gets around that. Well, that may be a very good instinct, and I might share it, but I'm not sure I'd like to know why. As I said, Your Honor, we did brief the issue of claim-splitting, and I do believe whether California bars on claim-splitting apply or federal bars on claim-splitting apply, the result is that you cannot do it. If it's the same nucleus of operative fact under federal rules, you can't bring those actions up in another action. You should have brought it in the action that you had. If it's the California primary rights theory, the primary right at issue here is clearly her right to certain, her purported right to certain disability benefits. And whether you frame that as a tort or as a contract claim, then you still have the same primary right. As a substantive matter, and I don't know whether this has been briefed, is there any possibility of the claims in the second case surviving if the, just on a collateral estoppel basis, if the first judgment is correct? I don't see how it survives, Your Honor. I don't see how you can be tortiously deprived of something which you do not have a right to have. I just don't see how that happens. I believe it would bar. I mean, the court's findings are pretty specific that there was no representation to her that she was entitled to an average of commission for disability leave. And plaintiffs have sort of argued in a schizophrenic way that she had a contractual right to these benefits, but they concealed it from her. Well, that doesn't make sense. A contract necessarily rests on representations made, promises made, and you can't hide those promises. So I don't see how the tort claims survive the court's summary judgment ruling on the contract claim. If there are no further questions, thank you. Thank you, counsel. I guess you have 11 seconds, and we'll give you a total of a minute, so go ahead. Thank you. Thank you, Your Honor. At 3-7, at 3-6-7, it's the passage that I read to you says she was giving the booklet describing the payroll practice which provided it. In the context, that payroll practice starts, or the sick leave and accident income plan starts at 3-6-7, and it says what's covered, dot, dot, dot, your salary. Her expectation was, and that's the basis for the position, that it had been an IBM salary for this entire time period that she had worked there. And in the record, as you can see from some of the colloquy in the e-mails that precede this, just right before this in the administrative record, even the management there in IBM had no idea that there was some alleged difference between one year and another in the context in personnel. So it wasn't that personnel had some clear dividing line within themselves to know what the difference was from one year to another. As is now asserted — How do we know when she received — I'm sorry. When did she receive this? Just make one quick point. One just quick point. And the quick point there is, how could she ever know — it goes to your point you asked counsel, Your Honor. How could she ever know? How was it ever explained to her that there was some difference, other than what a reasonable expectation and her entitlement as an IBM employee could have been, if personnel didn't even know? Excuse me. Is there evidence that she had this document? Is there evidence that she had the IBM sickness and accident income plan document at the relevant time? Well, at the relevant time would include 01, yes. Oh, not 01. In 99, no, there is not evidence. All right. Thank you very much, counsel. Thank you, Your Honor. Thank you, counsel. For IEOC versus International Business Machine Corp., the court is submitted and the court stands in recess.
judges: Canby, Fernandez, Berzon